1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16

| | |
|---|---|
| TODD HALL and DAN RIVERA, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>           vs.<br><br>LIVE NATION WORLDWIDE, INC., a Delaware Corporation, and Does 1 to 10, inclusive,<br><br>              Defendants. | CASE NO. CV 15-05609 MMM (PJWx)<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION TO REMAND |

17
18
19
20
21
22

      On June 23, 2015, Todd Hall and Dan Rivera (collectively "plaintiffs") filed this action individually and on behalf of similarly situated individuals in Los Angeles Superior Court against Live Nation Worldwide, Inc ("Live Nation").[1] Live Nation removed the action to this court on July 24, 2015, invoking the court's federal question jurisdiction. Live Nation asserted that several of plaintiffs' state law claims were preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.[2]

23
24
25
26

      On July 31, 2015 Live Nation filed a motion to dismiss plaintiffs' first and third causes of

27
28

[1]Complaint, Docket No. 1-2 (July 24, 2015).

[2]Notice of Removal, Docket No. 1 (July 24, 2015).

action.[3] Plaintiffs oppose this motion.[4]  On August 24, 2015, plaintiffs filed a motion to remand the case to state court,[5] which Live Nation opposes.[6]

## I.  FACTUAL BACKGROUND

On October 24, 2013, the International Alliance of Theatrical Stage Employees - Local 33 ("IATSE") allegedly entered into a collective bargaining agreement ("CBA") with Live Nation Hollywood (the "2013 CBA").[7]  The 2013 CBA governs the employment of "stagehands represented by [IATSE] in connection with concerts and events, . . . presented at the Hollywood Palladium" between October 1, 2013 and September 30, 2014.[8]  The 2013 CBA provides that it "will apply only to work performed from October 1, 2012 to September 20, 2014, and does not set [a] precedent for future events at this venue, nor grant the Union or any affiliated entity any rights (except as set forth herein) at this venue now or in the future."[9]

Plaintiffs allege that they were hired by Live Nation on January 11, 2015 to work as stagehands on a television production of the "20th Annual Critics' Choice Movie Awards," which was broadcast live from the Hollywood Palladium on January 15, 2015 (the "Production").[10]  The Production aired live

---

[3]Motion to Dismiss Plaintiff's First and Third Causes of Action ("MTD"), Docket No. 11 (July 31, 2015).  See also Reply in Support of Motion to Dismiss Plaintiff's First and Third Causes of Action ("MTD Reply"), Docket No. 27 (Oct. 7, 2015).

[4]Opposition re: Motion to Dismiss Plaintiffs' First and Third Causes of Cation ("MTD Opposition"), Docket No. 22 (July 22, 2015).

[5]Motion to Remand Case to Los Angeles Superior Court ("Remand Motion"), Docket No. 16 (Aug. 24, 2015).  See also Reply in Support of Motion to Remand Case to Los Angeles Superior Court ("Remand Reply"), Docket No. 28 (Oct. 7, 2015).

[6]Memorandum in Opposition to Motion to Remand Case to Los Angeles Superior Court ("Remand Opposition"), Docket No. 21 (Sept. 30, 2015).

[7]Complaint, ¶ 14.

[8]*Id.*, ¶ 15; Complaint, Exh. 2 (2013 Collective Bargaining Agreement ("2013 CBA").)

[9]*Id.*, ¶ 16.

[10]*Id.*, ¶¶ 7, 9-10.

2

on A&E Network on January 15, 2015.[11]  Plaintiffs were allegedly discharged from the Production that same date.[12]  As of the date the complaint was filed, Rivera had allegedly not received any compensation for his work on the Production.[13]  Hall purportedly received final compensation on February 9, 2015.[14]  Plaintiffs assert that those who worked on the Production were not paid final compensation for work performed as required by the California Labor Code.[15]

Plaintiffs allege on information and belief that IATSE and Live Nation did not enter into a new contract governing live events that covered the Production between September 20, 2014 and January 15, 2015.[16]  As a result, they assert, there was no collective bargaining agreement that allowed Live Nation to withhold a stagehand's wages in violation of the California Labor Code.[17]

Plaintiffs' first and third claims for relief, which seek penalty wages, unpaid minimum wages, and overtime compensation under California Labor Code §§ 203, 510, and 1194 respectively, are asserted on behalf of a class of all individuals who were employed by Live Nation in connection with the Critics' Choice awards show on January 15, 2015 (the "Critics' Choice Class").[18]  Their second claim for relief, which alleges failure to provide accurate wage statements under California Labor Code §§ 226 and 1174, is asserted on behalf of a class of individuals who were employed by Live Nation from one year prior to the commencement of this action until the date a class certification motion is filed ("the 226 Class").[19]  Plaintiffs also plead claims for unfair competition in violation of California Business &

---

[11]*Id.*, ¶ 7.

[12]*Id.*, ¶¶ 9-10.

[13]*Id.*, ¶ 9.

[14]*Id.*, ¶ 10.

[15]*Id.*, ¶ 11.

[16]*Id.*, ¶ 18.

[17]*Id.*

[18]*Id.*, ¶ 32.

[19]*Id.*

Professions Code §§ 17200 et seq.; civil penalties under California Labor Code § 2698; and failure to provide employment records upon request under California Labor Code §§ 226 and 1198.5.

In its notice of removal, Live Nation alleges that although the prior collective bargaining agreement ("CBA") expired on September 30, 2014, Live Nation and IATSE entered into a new CBA on June 22, 2015, which explicitly covers work performed between October 1, 2014 to September 30, 2016.[20] Live Nation also alleges that after the expiration of the earlier CBA on September 30, 2014, the parties to that agreement continued to honor its terms while negotiating a new CBA.[21]

## II.  DISCUSSION

### A.    Requests for Judicial Notice

Live Nation asks the court to take judicial notice of two documents related to its motion:[22] the 2015 CBA, and a Certificate of Merger between Live Nation NYC Concerns, Inc., LN Hollywood, Inc., and Live Nation Worldwide, Inc.[23]

In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). A court normally must convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings. . . .  A court may, however, consider certain materials – documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice – without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

---

[20]Removal, Docket No. 1 (July 24, 2015), § 10(c); Request for Judicial Notice ("RJN"), Docket No. 12-1 (July 31, 2015), Exh. 1 (Live Nation & IATSE Local 33 Legit Agreement Hollywood Palladium ("2015 CBA").)

[21]Notice of Removal.

[22]Request for Judicial Notice re Motion to Dismiss Plaintiff's First and Third Causes of Action ("RJN"), Docket No. 12 (July 31, 2015).

[23]RJN, Exh. 2 (Certificate of Merger).

Under Rule 201 of the Federal Rules of Evidence, courts frequently take judicial notice of public filings.  See *Velazquez v. GMAC Mortg. Corp.*, 605 F.Supp.2d 1049, 1057–58 (C.D. Cal. 2008) (taking judicial notice of documents recorded by the Los Angeles County Recorder's Office, including deeds of trust); see also *Krug v. Wells Fargo Bank, N.A.*, No. 11–CV–5190 YGR, 2012 WL 1980860, *2 (N.D. Cal. June 1, 2012) (public records are judicially noticeable under Rule 201); *Grant v. Aurora Loan Servs., Inc.*, 736 F.Supp.2d 1257, 1264 (C.D. Cal. 2010) (noting that a "[party] provided a reference number for the document, showing that it was in fact recorded; this demonstrates that it is a public record"); *Fimbres v. Chapel Mortg. Corp.*, No. 09-CV-0886-IEG (POR), 2009 WL 4163332, *3 (S.D. Cal. Nov. 20, 2009) (taking judicial notice of a deed of trust, notice of default, notice of trustee's sale, assignment of deed of trust, and substitution of trustee as each was a public record); *Angulo v. Countrywide Home Loans, Inc.*, No. 1:09-CV-877-AWI-SMS, 2009 WL 3427179, *3 n. 3 (E.D. Cal. Oct. 26, 2009) ("The Deed of Trust and Notice of Default are matters of public record.  As such, this court may consider these foreclosure documents").  For this reason, the court takes judicial notice of the Certificate of Merger, which is dated and time stamped and was filed with the Delaware Secretary of State, Division of Corporations on May 23, 2009.[24]

Further, because the motions to dismiss and remand raise the issue of complete preemption, and "[b]ecause complete preemption often applies to complaints drawn to evade federal jurisdiction, [the] court may look beyond the face of the complaint to determine whether the claims alleged as state law causes of action in fact are necessarily federal claims."  *Parrino v. FFIP, Inc.*, 146 F.3d 699, 704 (9th Cir. 1998), superseded by statute on other grounds as stated in *Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006).  This is true even when the issue is raised by a Rule 12(b)(6) motion. *Id.* ("Because removal was based on complete preemption in this case, the district court properly considered the Master Group Application").   See also *Peterson v. Spaich Farms, Inc.*, No. CIV-S-98-2274DFLPAN, 1999 WL 793942, *1 (E.D. Cal. Sept. 29, 1999) ("Complete preemption has thus been described variously as an 'independent corollary' to the well-pleaded complaint rule, and an 'exception to the well-pleaded complaint rule,'"quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393

---

[24]Certificate of Merger.

1  (1987); *Associated Builders & Contractors v. Local 302, International Brotherhood of Electrical*

2  *Workers*, 109 F.3d 1353, 1356 (9th Cir. 1997)).  Because the 2015 CBA forms the basis for Live

3  Nation's argument that certain of plaintiffs' claims are completely preempted by the LMRA, the court

4  can consider it in deciding the motions.[25]

5       The court therefore grants Live Nation's request for judicial notice.[26]

6  **B.     Whether Plaintiffs' First and Third Causes of Action Must Be Dismissed**

7       **1.     Legal Standards Governing Motions to Dismiss Under Rule 12(b)(6)**

8       A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

9  A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory,"

10  or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica*

11  *Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations

12  pleaded in the complaint as true, and construe them and draw all reasonable inferences from them

13  in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.

14

---

15       [25]To support a finding of complete preemption, the preemptive force of the federal statute at issue
16  must be "extraordinary."  See *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987); *Holman v.*
17  *Laulo-Rowe Agency*, 994 F.2d 666, 668 (9th Cir. 1993) ("The [complete preemption] doctrine applies
   in select cases where the preemptive force of federal law is so 'extraordinary' that it converts state
18  common law claims into claims arising under federal law for purposes of jurisdiction," citing
   *Caterpillar*, 482 U.S. at 386).  For this reason, the complete preemption doctrine is narrowly construed.
19  See *Holman*, 994 F.2d at 668 ("The [complete preemption] doctrine does not have wide applicability;
   it is a narrow exception to the 'well-pleaded complaint rule'"); *Gatton v. T-Mobile USA, Inc.*, No. SACV
20  03-130 DOC, 2003 WL 21530185, *5 (C.D. Cal. Apr. 18, 2003) ("The complete preemption doctrine
   is, however, extremely narrow," citing *TPS Utilicom Services, Inc. v. AT & T Corp.*, 223 F.Supp.2d
21  1089, 1097 (C.D. Cal. 2002)).  "[O]nly three areas have been deemed areas of complete preemption by
   the United States Supreme Court: (1) claims under the [LMRA]; (2) claims under the Employment
22  Retirement and Insurance Security Act (ERISA); and (3) certain Indian land grant rights." *Gatton*, 2003
23  WL 21531085 at *5; see also *Robinson v. Michigan Consolidated Gas Co., Inc.*, 918 F.2d 579, 585 (9th
   Cir. 1990) ("complete preemption . . . is extremely limited, existing only where a claim is preempted
24  by [the LMRA]; where a state law claim alleges a present right to possession of Indian tribal lands; and
   where state tort or contract claims are preempted by [ERISA]" (internal citations omitted)).
25

26       [26]Plaintiffs object to consideration of the Declaration of Joseph Kaplon in Support of Defendant's
   Motion to Dismiss and the Declaration of Stacey Levine in Support of Defendant's Opposition to
27  Plaintiffs' Motion to Remand.  (Objection to Evidence Filed re . . . Motion to Dismiss, Docket No. 23
   (Sept. 30, 2015); Objection to Evidence in Support of . . . Motion to Remand, Docket No. 30 (Oct. 7,
28  2015).)  Because the court does not rely on this evidence, it need not rule on plaintiffs' objections.

1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### 2.    Legal Standard Governing § 301 Preemption

Live Nation contends that plaintiffs' first and third causes of actions must be dismissed because they are preempted by section 301(a) of the LMRA. Section 301(a) of the LMRA gives federal courts exclusive jurisdiction to hear "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). See *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for So. Cal.*, 463 U.S. 1, 23 (1983) ("The preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301"); see also *Caterpillar*, 482 U.S. at 394 ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement,'" quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n. 3 (1987)). Section 301 "mandate[s] resort to federal

rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes." *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 404 n. 3 (1988).

To further the goal of uniform interpretation of labor contracts, the preemptive effect of § 301 has been extended beyond suits that allege the violation of a collective bargaining agreement. See *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-11 (1985) ("The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation"). Thus, a state law claim will be preempted if it is so "inextricably intertwined" with the terms of a labor contract that its resolution will require judicial interpretation of those terms. *Id.* at 213 (holding that a claim for breach of the duty of good faith and fair dealing was preempted by § 301 because "good faith" and "fair dealing" had to be assessed with reference to the contractual obligations of the parties).

Despite the broad preemptive effect of § 301, a claim that seeks to vindicate "nonnegotiable state-law rights . . . independent of any right established by contract" is not within its scope. *Allis-Chalmers Corp.*, 471 U.S. at 213; see also *Livadas v. Bradshaw*, 512 U.S. 107, 123-24 (1994) ("[Section] 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law. . . . [I]t is the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement . . . that decides whether a state cause of action may go forward" (citations omitted));[27] *Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F.Supp.3d 932, 951 (C.D. Cal. 2014) ("Despite the broad preemptive effect of § 301, a claim that seeks to vindicate 'nonnegotiable state-law rights . . . independent of any right established by contract' is not within its scope," quoting *Allis-Chalmers Corp*., 471 U.S. at 213). As a result, if a state law cannot be waived or modified by private contract, and if the rights it creates can be enforced without resort to the particular terms, express or implied, of a labor contract, § 301 does not preempt a claim for violation of the law.

---

[27]The *Livadas* Court held that the state law claim asserted in that case required only that the court "look to" the CBA to determine the applicable rate of pay. The fact that there was "no indication . . . there was a 'dispute'" regarding the rate of pay, it held, "foreclose[d] even a colorable argument" of preemption. *Livadas*, 512 U.S. at 124-25.

1   See *Miller v. AT & T Network Systems*, 850 F.2d 543, 546 (9th Cir. 1988).  "If the claim is plainly based

2   on state law, [moreover,] § 301 preemption is not mandated simply because the defendant refers to the

3   CBA in mounting a defense."  *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir.

4   2001) (en banc), cert. denied 534 U.S. 1078 (2002).

5        Nor can a defendant invoke preemption merely by alleging a "hypothetical connection between

6   the claim and the terms of the CBA," or a "creative linkage" between the subject matter of the suit and

7   the wording of the CBA.  *Id.* at 691-92.  To prevail, "the proffered interpretation argument must reach

8   a reasonable level of credibility."  *Id.* at 692.  A preemption argument is not credible "simply because

9   the court may have to consult the CBA to evaluate [a plaintiff's claim]; [similarly,] 'look[ing] to' the

10  CBA merely to discern that none of its terms is reasonably in dispute does not require preemption."  *Id.*

11  (quoting *Livadas*, 512 U.S. at 125).

12       In *Cramer*, the Ninth Circuit clarified the scope of the LMRA's preemptive effect:

13           "To the extent our prior cases held or implied that preemption was proper because of the

14           mere possibility that the subject matter of the claim was a proper subject of the collective

15           bargaining process, whether or not specifically discussed in the CBA, we today hold

16           such statements to be an incorrect articulation of § 301 preemption principles.  A state

17           law claim is not preempted under § 301 unless it necessarily requires the court to

18           interpret an existing provision of a CBA that can reasonably be said to be relevant to the

19           resolution of the dispute."  *Id.* at 693.

20  See also *Humble v. Boeing Co.*, 305 F.3d 1004, 1007-08 (9th Cir. 2002) (recognizing that *Cramer*

21  "revised [the] framework for analyzing § 301 preemption and synthesized the considerations involved").

22       The Ninth Circuit has articulated a two-part test to determine whether a cause of action is

23  preempted by the LMRA.  *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007).  First,

24  the court must determine "whether the asserted cause of action involves a right conferred upon an

25  employee by virtue of state law, not by a CBA.  If the right exists solely as a result of the CBA, then the

26  claim is preempted, and . . . analysis ends. . . .  If however, the right exists independently of the CBA,

27  [the court] must still consider whether it is nevertheless 'substantially dependent on analysis of a

28  collective-bargaining agreement.'  If such dependence exists, then the claim is preempted by section

301; if not, then the claim can proceed under state law." *Id.* at 1059-60 (citations omitted).

### 3.     Whether Plaintiffs' Employment Was Governed by a Collective Bargaining Agreement

Plaintiffs assert that their state claims are not preempted by the LMRA because there was no CBA in effect while they were employed. Live Nation notes the existence of two CBAs: the 2013 and 2015 agreements.

### (a)     Whether Plaintiffs' Employment Was Governed by the 2013 CBA

The 2013 CBA was in effect from October 1, 2012 to September 30, 2014.[28] It specifically states that it "appl[ies] only to work performed from October 1, 2012 to September 20, 2014, and does not set precedent for future events at this venue, nor grant the Union or any affiliated entity any rights (except as set forth herein) at this venue now or in the future."[29] Live Nation nonetheless argues that, while plaintiffs were not hired until January 11, 2015, the 2013 CBA applies.

CBAs are interpreted according to ordinary contract principles. *M & G Polymers USA, LLC v. Tackett*, __ U.S. __, 135 S.Ct. 926, 937 (2015) (applying ordinary contract principles in interpreting a collective bargaining agreement); *Adair v. City of Kirkland*, 16 Fed. Appx. 644, 646 (9th Cir. July 19, 2001) (Unpub. Disp.) ("After reviewing the record, we conclude that the district court properly applied state law contract principles and relied on extrinsic evidence . . . to determine that the parties [to the CBA] intended the salary to cover the briefing time as part of the officers' normally scheduled work day").

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." CAL. CIV. CODE § 1636. Such intent is to be inferred, if possible, solely from the "written provisions of the contract." *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822 (1990). If the contractual language is clear and explicit, it governs. CAL. CIV. CODE § 1638. See *Admiral Ins. Co. v. Kay Auto. Distributors, Inc.*, 82 F.Supp.3d 1175, 1178 (C.D. Cal. 2015) ("Under California law, '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit.' 'The words

---

[28]Complaint, ¶ 15; 2013 CBA at 17.

[29]Complaint, ¶ 16; 2013 CBA, § XXI.

1  of a contract are to be understood in their ordinary and popular sense . . . unless used by the parties in

2  a technical sense, or unless a special meaning is given to them by usage,'" quoting CAL. CIV. CODE §§

3  1638, 1644); *Kramer v. Puracyp, Inc.*, No. D065400, 2015 WL 1260746, *4 (Cal. App. Mar. 18, 2015)

4  (Unpub. Disp.) ("When a dispute arises over the meaning of contract language, the first question to be

5  decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party.  If

6  it is not, the case is over," quoting *S. Cal. Edison Co. v. Superior Court*, 37 Cal.App.4th 839, 848

7  (1995)).[30]

8          Courts have, in some cases, held that a CBA can be enforced beyond its expiration date where

9  the parties have, through their actions, expressed an intent so to be bound.  See, e.g., *O'Connor Co. v.*

10  *Carpenters Local Union No. 1408 of United Brotherhood of Carpenters & Joiners of Am., AFL-CIO*,

11  534 F.Supp. 484, 485-86 (N.D. Cal. 1982) ("It may also be true that the broad arbitration provisions of

12  the 1977-1980 Agreement survived its termination because the parties so intended"), aff'd, 702 F.2d 824

13  (9th Cir. 1983).

14          In this case, however, the parties' intent is clear from the face of the 2013 CBA.  The contract

15  not only sets forth an expiration date, but includes a clause explicitly stating that the agreement does not

16  set precedent for or govern the rights or obligations of the parties beyond its expiration date.  It is thus

17  clear the parties intended that the 2013 CBA not apply beyond its expiration date of September 20, 2014.

18  See *Office and Professional Employees Insurance Trust Fund v. Laborers Funds Administrative Office,*

19  *Inc.*, 783 F.2d 919, 921 (9th Cir. 1986) ("Ninth Circuit cases foreclose us from finding that the district

20  court had subject matter jurisdiction over that part of OPEIT's claim based on the expired CBA");

21  *Lumber Production Industrial Workers Local No. 1054 v. West Coast Industrial Relations Ass'n, Inc.*,

22  775 F.2d 1042, 1046 (9th Cir. 1985)("It logically follows that an expired [collective bargaining]

23  agreement cannot serve as the basis for a proper exercise of jurisdiction under section 301(a)"); *Cement*

24  _____

25      [30]"Although the court is not bound by unpublished decisions of intermediate state courts,
unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority."

26  *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov.
2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.

27  2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential

28  value")).

1  *Masons Health and Welfare Trust Fund v. Kirkwood-Bly, Inc.*, 520 F.Supp. 942, 944-46 (N.D. Cal.

2  1981) ("Plaintiffs cite no case, nor can we find any, which ha[s] permitted district courts to enforce

3  properly expired collective bargaining agreements in a section 301 action"), aff'd, 692 F.2d 641 (9th

4  Cir. 1982).

5      Contrary to the plain language of the contract, Live Nation argues that the 2013 CBA governed

6  the terms of plaintiffs' employment because it had a duty to continue the status quo under § 8(a)(5) of

7  the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(5) and (d), until the parties bargained

8  to impasse or reached a new agreement.  Live Nation argues that this is sufficient to imply a contract

9  extending the terms of the 2013 CBA and to preempt plaintiffs' state law claims.  This misapprehends

10 the applicable law.  An employer's duty to maintain the status quo under § 8(a)(5) does not create a

11 cause of action under section 301 that preempts state law claims.  *Derrico v. Sheehan Emergency Hosp.*,

12 844 F.2d 22, 27 (2d Cir. 1988) ("We must conclude that the CBA must be considered defunct upon its

13 expiration for all purposes except definition of the status quo.  Therefore, after expiration of the CBA

14 there is no contract subject to section 301 and there can be neither removal jurisdiction nor preemption

15 under section 301"); *Kirkwood-Bly, Inc.*, 520 F.Supp. at 944 ("[P]laintiffs' suit depends entirely upon

16 the existence of section 8(a)(5) which requires the employer to maintain the status quo during

17 negotiations for a new collective bargaining agreement.  This is obviously done in reference to the prior

18 agreement, and, therefore, the collective bargaining agreement can be said to 'survive' its expiration.

19 However, it does so only because of section 8(a)(5).  Plaintiffs cite no case, nor can we find any, which

20 have permitted district courts to enforce properly expired collective bargaining agreements in a section

21 301 action").

22      In sum, the 2013 CBA did not govern the terms of plaintiffs' employment in January 2015 and

23 cannot form the basis for an argument that plaintiffs' state law claims are preempted.

24          **(b)     Whether Plaintiffs' Employment Was Governed by the 2015 CBA**

25 Live Nation next argues that the 2015 CBA applies retroactively to cover plaintiffs' employment

26

27

28

in January 2015.[31]  The 2015 CBA was signed on June 22, 2015, but states that it applies retroactively to work performed from October 1, 2014 to September 30, 2016.[32]

Plaintiffs contend the 2015 CBA agreement does not apply because it had not been negotiated at the time they worked for Live Nation.  Employers and unions, however, can enter into a valid CBA that retroactively covers the bargaining period.  See *University of Hawaii Professional Assembly v. Cayetano*, 183 F.3d 1096, 1100 (9th Cir. 1999) (accepting without question that a new CBA applied retroactively because the contract so stated); *Winery, Distillery & Allied Workers Union, Local 186 v. E & J Gallo Winery, Inc.*, 857 F.2d 1353, 1357-58 (9th Cir. 1988) (holding that a new CBA applied retroactively to the period of bargaining even though this was not explicitly stated in the CBA)*; Mendez v. Mid-Wilshire Health Care Ctr.*, 220 Cal.App.4th 534, 542 (2013) ("Moreover, while it is true that Mid-Wilshire had already fired Mendez when the second collective bargaining agreement was executed, the new agreement applied retroactively to a date prior to Mendez's termination"); see also *Giles v. Univ. of Toledo*, 286 Fed. Appx. 295, 302 (6th Cir. July 16, 2008) (Unpub. Disp.) ("We have held that a union and an employer can contract to cover matters that occurred at earlier points in time.  In other words, parties may agree to 'backdate' the effective date of a newly created CBA," citing *Mail-Well Envelope, Cleveland Div. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 54*, 916 F.2d 344, 346-47 (6th Cir. 1990); *Local 377, Chauffeurs v. Humility of Mary Health Partners*, 296 F.Supp.2d 851,

---

[31]At the hearing, plaintiffs argued that the court could not consider the 2015 CBA as a basis for federal jurisdiction because the agreement had not been attached to the notice of removal.  While it is true that the 2015 CBA was not itself attached to the notice of removal, the allegations in the notice specifically referenced the 2015 agreement, and the fact that it covered work from October 1, 2015 to September 30, 2016. (See Notice of Removal, ¶ 10(c).)  The notice also referenced the Declaration of Tracy Wagner, simultaneously filed in support thereof, (see *id.*, ¶ 10(b)), and noted that the 2015 CBA was attached as Exhibit A to her declaration.  Consequently, the notice of removal and related documents adequately identified the 2015 CBA as a basis upon which defendant claimed federal question jurisdiction.  Even were this not the case, in determining whether removal jurisdiction exists, the court is not limited to documents attached to the notice of removal.  Rather, a court can consider supplemental evidence later proffered by the removing defendant.  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n. 1 (9th Cir.2002) ("The district court did not err in construing Petsmart's opposition as an amendment to its notice of removal," citing *Willingham v. Morgan*, 395 U.S. 402, 407 n. 3 (1969) ("it is proper to treat the removal petition as if it had been amended to include the relevant information contained in the later-filed affidavits")).

[32]2015 CBA at 17.

13

859 (N.D.Ohio 2003)); *Mail-Well Envelope*, 916 F.2d at 346-47 ("Mail-Well appears to argue, first, that the admitted fact that these discharges occurred before the effective date of the new contract ends the matter. Because there was no contract in existence at the time of the discharges, Mail-Well argues, there could be no obligation to arbitrate the discharges. It appears clear to us, however, that the parties could create an obligation to arbitrate these discharges by the new contract. Mail-Well points to no law, and we know of none, which would undercut the power of Mail-Well and the Union so to contract"); *O'Conner v. Hilton Hawaiian Vill.*, 763 F.Supp. 1544, 1548 (D. Haw. 1990) ("However, § 2 of the CBA provides for retroactive effect of the CBA, stating that '[t]his Agreement shall remain in effect from March 1, 1987, until and including February 28, 1990.' Thus, the Agreement covers the time in which O'Conner worked at Hilton"); *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 148 Wash.App. 907, 910-11 (2009) ("Here, the parties expressed their intent to retroactively apply all of the CBAs' terms when they signed each new CBA. When fully executed, each new CBA applied retroactively, covering any grievances that occurred between the dates set forth in the new agreement"). The court therefore finds that the 2015 CBA applied retroactively and governed plaintiffs' employment in January 2015.[33]

---

[33]Plaintiffs argue that the 2015 CBA is invalid because the parties to that contract are IATSE "Local 33" and "LN Hollywood, Inc." as opposed to Live Nation. They contend LN Hollywood, Inc. was not licensed to do business at the time the contract was signed. The circumstances surrounding execution of the 2015 CBA indicate that the parties mistakenly used LN Hollywood, Inc., and Live Nation interchangeably and intended that the contract be between Live Nation and IATSE. The contract, for example, incorporates a "side letter," signed the same day as the 2015 CBA, which states that "[t]his letter shall serve as formal documentation to the agreement made between Live Nation Worldwide, Inc., (hereinafter 'Live Nation') and IATSE Local 33 (hereinafter 'Local 33') during the course of the negotiations for the 2014-2016 collective bargaining agreement between the parties." The letter, which is signed by a representative of Live Nation and IATSE's business representative, is evidence that both parties intended that the 2015 CBA be between Live Nation and IATSE; thus, the reference to LN Hollywood, Inc. appears to have been a clerical error. (2015 CBA at 22.) The fact that Live Nation Worldwide is the successor of Live Nation Hollywood, Inc., (Certificate of Merger), further suggests that the inclusion of LN Hollywood instead of Live Nation was a clerical oversight due, e.g., to a failure to update the CBA's language after the merger.

As noted, the goal of contract interpretation is to give effect to the mutual intention of the parties. Cal. Civ. Code § 1636. The court therefore will not disregard the 2015 CBA, as it appears that the parties intended that Live Nation be a party to that contract.

1

### 4.  Whether § 301 Preempts Plaintiffs' First and Third Causes of Action

2      Having concluded that the 2015 CBA governed plaintiffs' employment in January 2015, the

3  court next examines whether plaintiffs' claims are preempted by § 301 of the LMRA.

4      ### (a)  Whether Plaintiffs' First Cause of Action is Preempted

5      Plaintiffs' first cause of action seeks continuing wage penalties under Labor Code § 203, based

6  on Live Nation's alleged failure to pay final wages in a timely fashion under Labor Code § 201.[34]  Live

7  Nation argues that the payment of final wages is governed by the 2015 CBA and that the claim is

8  preempted by § 301.

9      Plaintiffs counter that the claim is not preempted because it is based on nonnegotiable state-law

10  rights.  California Labor Code § 201 states: "If an employer discharges an employee, the wages earned

11  and unpaid at the time of discharge are due and payable immediately."  Labor Code §§ 201.5 and 201.9

12  set forth exceptions to this general rule that apply to employees in the entertainment industry.  See CAL.

13  LAB. CODE §§ 201.5, 201.9.  See also *id.*, § 203(a).  Plaintiffs argue that § 201.5 applies,[35] while Live

14  Nation argues that § 201.9 applies.

15      Section 201.5 applies to employees involved in the production of motion pictures, including "the

16  development, creation, presentation, or broadcasting of theatrical or televised motion pictures, television

17  programs, commercial advertisements, music videos, or any other moving images, including, but not

18  limited to, productions made for entertainment, commercial, religious, or educational purposes, whether

19  these productions are presented by means of film, tape, live broadcast, cable, satellite transmission, Web

20  cast, or any other technology that is now in use or may be adopted in the future." *Id.*, § 201.5.  Section

21  201.9 applies to individuals who are "employed at a venue that hosts live theatrical or concert events

22  and are enrolled in and routinely dispatched to employment through a hiring hall or other system of

23  regular short-term employment."  *Id.*, § 201.9.

24      The plain text of the statutes indicates that they are not mutually exclusive.  Both statutes would

25

26      ─────────────

[34]Complaint, ¶¶ 41-45.

27

28  [35]Although plaintiffs allege in their complaint and argue in their opposition that Labor Code § 201.5, rather than Labor Code § 201.9 applies, they also plead that § 201.9 applies.  (*Id.*, ¶ 33.)

appear to apply where, as here, an employee works on presentation of a live broadcast at a venue that hosts live theatrical or concert events. The complaint alleges that plaintiffs were involved in "the television production of the '20th Annual Critics' Choice Movie Awards,' broadcast[ ] live from the Hollywood Palladium."[36] Accepting this allegation as true, plaintiffs' employment would appear to be covered by § 201.5. As for § 201.9, the 2015 CBA states that the union will provide stagehands "through its dispatch office."[37] While plaintiffs do not allege that the Palladium is "a venue that hosts live theatrical or concert events," as required for application of § 201.9, the court takes judicial notice of the fact, as reflected in articles published in the *Los Angeles Times.*[38] Thus, plaintiffs' employment is apparently governed both by § 201.5 and by § 201.9.

Neither § 201.5 nor § 201.9 provides nonnegotiable state-law rights, however, as both expressly authorize employers and employees to set alternate rules for the final payment of wages in a collective bargaining agreement. CAL. LAB. CODE § 201.5(e) ("Nothing in this section prohibits the parties to a valid collective bargaining agreement from establishing alternative provisions for final payment of

---

[36]*Id.*, ¶ 7.

[37]2015 CBA, § V.A.

[38]Valerie Reitman, *Palladium Operator Plans Major Renovation*, LOS ANGELES TIMES, Apr. 12, 2007, available at http://articles.latimes.com/2007/apr/12/local/me-palladium12 ("The theater opened Sept. 23, 1940, with performances by the Tommy Dorsey Orchestra and Frank Sinatra. Over the years, it has played host to the Emmy Awards, the Grammy Awards, the Rolling Stones, James Brown, Led Zeppelin, Madonna, Barbra Streisand and hundreds of others"); August Brown, *The Hollywood Palladium is for Sale*, LOS ANGELES TIMES, June 5, 2012, available at http://latimesblogs.latimes.com/music_blog/2012/06/the-hollywood- palladium-is-for-sale.html ("The historic, Live Nation-leased concert venue was built by L.A. Times publisher Norman Chandler in 1940, and reopened in 2008 after an extensive 2007 remodel. It has hosted concerts from legendary acts including Frank Sinatra, U2, Tommy Dorsey and Jay-Z and remains a fixture of the L.A. live music scene").

Courts can take judicial notice of newspaper articles when the facts recited in the articles are generally known within the territorial jurisdiction of the court or capable or accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. See, e.g., *In re Am. Apparel, Inc. S'holder Litig.*, 855 F.Supp.2d 1043, 1063 (C.D. Cal. 2012). As the facts in these articles are generally known within the territorial jurisdiction of the court, judicial notice is appropriate here. See *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454 (9th Cir. 1995) (concluding that the district court properly took judicial notice of layoffs that had occurred at Hughes Aircraft based on a newspaper article because the fact that the layoffs occurred was "a fact which would be generally known in Southern California and which would be capable of sufficiently accurate and ready determination").

wages to employees covered by this section if those provisions do not exceed the time limitation established in Section 204");[39] *id.*, § 201.9 ("these employees and their employers may establish by express terms in their collective bargaining agreement the time limits for payment of wages to an employee who is discharged or laid off").[40]  As a result, it cannot be said that the first cause of action is based on nonnegotiable state-law rights.

Stated differently, under both §§ 201.5(e) and 201.9, § 201 does not apply when the parties have agreed to alternate rules in a collective bargaining agreement.  If the 2015 CBA waived § 201 rights in favor of alternate final wage payment provisions, therefore, plaintiffs' right to payment exists solely as a result of the CBA and a claim based on that right is preempted.  See *Burnside*, 491 F.3d at 1059 ("If the right exists solely as a result of the CBA, then the claim is preempted, and our analysis ends there").

---

[39]The 2015 CBA complies with the time limitations established by § 204.  CAL. LAB. CODE § 204(a) ("Labor performed between the 1st and 15th days, inclusive, of any calendar month shall be paid for between the 16th and the 26th day of the month during which the labor was performed, and labor performed between the 16th and the last day, inclusive, of any calendar month, shall be paid for between the 1st and 10th day of the following month"); *id.*, § 204(d) ("The requirements of this section shall be deemed satisfied by the payment of wages for weekly, biweekly, or semimonthly payroll if the wages are paid not more than seven calendar days following the close of the payroll period").  The 2015 CBA states that "wages for work performed on the Event shall be mailed to the Employee not later than seven (7) days after the end of the regular pay period for the Employer corresponding to the dates work was performed for the Event and in the event of an involuntary termination (as defined in section A above) or a resignation, unpaid wages for work performed prior to the issuance of written notice of termination or resignation shall be mailed to the Employee not later than seven (7) days after the end of the regular pay period during which the Employee was involuntarily terminated or resigned."  (2015 CBA, § VII.B).  This provision comports with the time limitations on the payment of regular wages set forth in § 204.

[40]Plaintiffs cite *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1111 (9th Cir. 2000) for the proposition that Labor Code § 201.5 creates a non-waivable right. After *Balcorta* was decided, however, in 2008, the California legislature amended § 201.5 to permit employees and employers to establish alternate provisions for final payment of wages in collective bargaining agreements, so long as the bargained-for provisions do not exceed the time limitations set forth in Labor Code § 204.  See CAL. LAB. CODE § 201.5 ("Nothing in this section prohibits the parties to a valid collective bargaining agreement from establishing alternative provisions for final payment of wages to employees covered by this section if those provisions do not exceed the time limitation established in Section 204"); California Bill Analysis, A.B. 3051 Assem., 8/7/2006 ("The Senate amendments delete the Assembly version of this bill, and instead . . . [p]rovide that this bill does not prohibit the parties to a valid collective bargaining agreement from establishing alternative provisions for final payment of wages to employees covered by this bill if those provisions do not exceed the time limitation established in current law").

17

The 2015 CBA not only sets forth alternate final wage payment provisions, but explicitly waives the protections of the Labor Code.  See *Gregory v. SCIE, LLC*, 317 F.3d 1050, 1054 (9th Cir. 2003) ("the CBA must include 'clear and unmistakable' language waiving the covered employee's state right 'for a court even to consider whether it could be given effect,'" quoting *Cramer*, 255 F.3d at 692).

Section VII.B of the 2015 CBA states:

"Pursuant to the authority granted in California Labor Code Section 201.9 and 204(c), this Agreement waives the requirements for the timing of wages specified in [the] California Labor Code, including but not limited to, Section 201 (pertaining to wages due at termination of employment) and Labor Code Section 204 (requiring semi-monthly payments within specified dates for work performed within specified dates).  In lieu of the requirements provided in those provisions, wages for work performed on the Event shall be mailed to the Employee not later than seven (7) days after the end of the regular pay period for the Employer corresponding to the dates work was performed for the Event and in the event of an involuntary termination (as defined in section A above) or a resignation, unpaid wages for work performed prior to the issuance of written notice of termination or resignation shall be mailed to the Employee not later than seven (7) days after the end of the regular pay period during which the Employee was involuntarily terminated or resigned."

As can be seen, the provision explicitly waives the protections of Labor Code §§ 201 and 204 and establishes alternate terms for final wage payments.  Based on plaintiffs' allegations and §§ 201.5(e) and 201.9, therefore, section VII.B applies, and the first cause of action is preempted by § 301.[41]

---

[41]At the hearing, plaintiffs argued this case was similar to *Gregory*, 317 F.3d at 1053.  They asserted that the terms of the 2015 CBA are clear and that even if the court was required to look to it to determine plaintiffs' rights, it would not be required to *interpret* it.  See *Gregory*, 317 F.3d at 1053 ("Here, Gregory's claim is based entirely on state law.  There is no dispute over the terms of the CBA or its interpretation.  While overtime is calculated in accordance with the terms of the CBA, this case involves no issue concerning the method of calculation.  The issue here is not how overtime rates are calculated but whether the result of the calculation complies with California law").  In *Gregory*, plaintiff asserted a state law right – the right of an employee receiving less than the legal overtime compensation owed to recover the unpaid balance.  CAL. LAB. CODE § 1194.  See *Gregory*, 317 F.3d at 1051.  While the CBA governed his entitlement to overtime, and thus had to be consulted to determine whether he

18

1

**(b)       Whether Plaintiffs' Third Cause of Action is Preempted**

2      Plaintiffs' third cause of action alleges failure to pay minimum and overtime wages in violation

3      of Labor Code §§ 510 and 1194.  Plaintiffs assert they "worked many hours without timely

4      compensation for all the work they performed, as required by law," and that Live Nation "failed to

5      timely pay plaintiff(s) and other members of the class their minimum and overtime wages as required

6      by Sections 204, 510, and 1194 of the California Labor Code."[42]

7      Labor Code § 204 provides in part that "when employees are covered by a collective bargaining

8      agreement that provides different pay arrangements, those arrangements shall apply to the covered

9      employees."  The rights set forth in § 204 are therefore waivable.  As noted, Section VII.B of the 2015

10      CBA explicitly waives rights under § 204 and sets forth alternate provisions.

11      Live Nation contends that although plaintiffs assert the third cause of action under §§ 204, 510,

12      and 1194, the crux of plaintiffs' allegations is not that overtime was not paid or was paid in an improper

13      amount, but rather that payment was not timely.  As a result, it contends that the claim is preempted

14      because the 2015 CBA supersedes the timeliness provisions of § 204 under § 204(c).  Even were this

15      not the case, §§ 510 and 1194 require enforcement of a CBA, rather than Labor Code provisions, where

16      such an agreement exists.  Section 510 "do[es] not apply to the payment of overtime compensation to

17      an employee working pursuant to any of the following: . . . [A]n alternative workweek schedule adopted

18      pursuant to a collective bargaining agreement pursuant to Section 514."  CAL. LAB. CODE § 510.

19

20      had been paid for all overtime hours worked, the claim itself was based on state law rights. *Id.* at 1052-

21      53. See also *Cramer*, 255 F.3d at 691 ("The plaintiff's claim is the touchstone of [preemption] analysis;

      the need to interpret the CBA must inhere in the nature of the plaintiff's claim.  If the claim is plainly

22      based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA

23      in mounting a defense").  Here, however, the contrary is true.  Under Labor Code §§ 201.5 and 201.9,

      a valid CBA supplants state law.  Because they were covered by the 2015 CBA, plaintiffs' claims arise

24      under that contract, and the CBA "inheres in the nature" of the claim. *Burnside*, 491 F.3d at 1059-60.

      ("If the right exists solely as a result of the CBA, then the claim is preempted, and . . . analysis ends. .

25      . . If however, the right exists independently of the CBA, [the court] must still consider whether it is

26      nevertheless 'substantially dependent on analysis of a collective-bargaining agreement.'  If such

      dependence exists, then the claim is preempted by section 301; if not, then the claim can proceed under

27      state law").

28      [42]*Id.*, ¶ 52.

1    Section 514, in turn, states: "Sections 510 and 511 do not apply to an employee covered by a valid

2    collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and

3    working conditions of the employees, and if the agreement provides premium wage rates for all overtime

4    hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than

5    the state minimum wage." CAL. LAB. CODE § 514. The 2015 CBA establishes an alternate workweek

6    in Article X, and provides for the wages, hours of work, and working conditions of employees in Article

7    VIII. The same articles provide for overtime pay at well over 1.3 times the state minimum wage. Thus,

8    the 2015 CBA meets the requirements of § 514, and applies in lieu of § 510.[43]

9          Because under Labor Code §§ 204, 510, and 1194, a compliant CBA applies rather than the

10   Labor Code, the 2015 CBA governs plaintiffs' third cause of action. The claim is therefore preempted.[44]

11   See *Burnside*, 491 F.3d at 1073 (noting that in *Firestone v. Southern California Gas Co.*, 219 F.3d 1063

12   (9th Cir. 2000), the court held "that determining whether an employee was receiving a 'premium wage

13   rate' for overtime under a CBA, such that the employer would be exempt from section 510 of the

14   California Labor Code, was a dispute that could not be resolved without interpretation of the

15   agreement").

16          **5.     Whether Plaintiffs' Second, Fourth, and Fifth Causes of Action are**

17                 **Preempted**

18          The notice of removal and Live Nation's opposition to plaintiffs' motion to remand assert that

19   the second, fourth, and fifth causes of action are also preempted by the LMRA and provide a further

20

21          [43]Labor Code § 1194 does not create substantive rights, but a private right to enforce the
22   provisions of §§ 510 and 204.

23          [44]Plaintiffs argue that Labor Code § 219(a) applies to all of their statutory causes of action. That
     provision states: "[N]o provision of this article can in any way be contravened or set aside by a private
24   agreement, whether written, oral, or implied." The general language of § 219(a) is modified by the more
     specific provisions of §§ 201.9, 201.5, and 204, however. See CAL. CIV. CODE § 3534 ("Particular
25   expressions qualify those which are general"); *Santa Clarita Org. for Planning & the Env't (SCOPE)
     v. Abercrombie*, 240 Cal.App.4th 300, 318 (2015) ("In reconciling, we are to give effect to the more
26   specific statute"); *Hughes Electronics Corp. v. Citibank Delaware*, 120 Cal.App.4th 251, 270 (2004)
     ("[A] specific statutory provision relating to a particular subject controls over a more general provision.
27   That rule obtains even though the general provision standing alone is sufficiently broad to include the
28   subject to which the specific statute relates").

20

basis for federal question jurisdiction.[45]

Plaintiffs' second cause of action alleges failure to provide accurate wage statements in violation of Labor Code § 226, and failure to maintain accurate records in violation of Labor Code § 1174. The allegations supporting the cause of action are conclusory recitations of the substance of those statutory provisions. The claim does, however, incorporate the factual allegations of the first cause of action. As a result, the court construes the claim as based on the fact that payments (and accompanying pay stubs) were purportedly not provided in a timely fashion, and that the wage information not timely recorded. Because the only facts incorporated in the claim concern the timeliness of payment, the court agrees that, as presently pled, the second cause of action is derivative of the first, requires interpretation of the CBA, and is preempted.

The fourth cause of action, which alleges violation of Business and Professions Code § 17200, is based on the allegedly unfair and unlawful business practices pled in the first, second, and third causes of action. Because determining whether defendant acted unfairly or unlawfully as alleged in these claim requires interpretation of the CBA, the fourth cause of action is preempted.

Finally, the fifth cause of action, which seeks civil penalties under Labor Code § 2699.3(a), pleads that plaintiffs are entitled to recover civil penalties due to the statutory violations alleged in the first three causes of action. Consequently, this claim is derivative of those claims, and is preempted for the same reasons they are preempted.

### 6. Whether Plaintiffs' First and Third Causes of Action Must Be Dismissed

The fact that plaintiffs' first and third causes of action are preempted by § 301 is alone a sufficient basis for dismissal. See *Allis-Chalmers Corp.*, 471 U.S. at 220 ("We do hold that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law," citing *Avco Corp. v. Aero Lodge* 735, 390 U.S. 557 (1968)); *Tellez v. Pac. Gas & Elec. Co.*, 817 F.2d 536, 537 (9th Cir. 1987)("Actions in federal or state court alleging breach of a labor contract must either be brought under Section 301 and resolved

---

[45]Remand Opposition at 2; Removal, § 15.a.

according to federal law or dismissed as preempted"); *Dent v. Nat'l Football League*, No. C 14-02324 WHA, 2014 WL 7205048, *12 (N.D. Cal. Dec. 17, 2014) ("As such, this order holds that Claims Five, Six, Eight, and Nine are preempted by Section 301.  The motion to dismiss those claims is Granted").

Even were the court to treat the causes of action as federal claims seeking to enforce the terms of the 2015 CBA, however, as presently alleged, they would fail because plaintiffs are subject to the CBA's grievance and arbitration provisions.  Prior to filing suit, an employee seeking to vindicate personal rights under a collective bargaining agreement must first attempt to exhaust any mandatory or exclusive grievance procedures set forth in the agreement.  See *United Paperworkers Int'l. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37 (1987) ("The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute"); *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 163 (1983) ("Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement.  Subject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement" (citations omitted)); *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1189 (9th Cir. 2001) ("Insofar as Brown argues she was terminated in violation of the CBA, the agreement required her to pursue such claims in binding arbitration.  Because she failed to seek redress as provided in the CBA, she cannot now resort to the courts to adjudicate these claims").[46] Thus, an employee's failure to exhaust contractually mandated procedures precludes judicial relief for breach of a collective bargaining agreement and related claims.

The 2015 CBA states that "[i]n the event of a grievance arising out of the terms and conditions

---

[46]See also *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976) ("[W]e [have] held that an employee could not sidestep the grievance machinery provided in the contract and that unless he attempted to utilize the contractual procedures for settling his dispute with his employer, his independent suit against the employer in the District Court would be dismissed"); *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965) ("As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress").

of this [CBA], the parties agree that every effort shall be made to settle such grievance as harmoniously as possible through the following [three-step] procedure."[47]   The process requires an aggrieved employee to "register his/her complaint to the Head of his/her Department and Steward.  Any grievance of a bargaining unit Employee shall be brought to the attention of the designated Employer Representative in writing for a written disposition within a fourteen (14) calendar day period."[48]  "If an agreement is not reached under Step 1, the Employer Representative shall meet with the Business Representative of the Union and the Steward, and shall give the Union written disposition of the grievance within fourteen (14) calendar days."[49]  Finally, "[i]f an agreement is not reached under Step 2, the Employer Representative and the Union's International Representative, and the Business Representative of the Union may meet in an attempt to resolve the grievance within a fourteen (14) calendar day period."[50]  In the event the parties are unable to reach agreement at any of these steps, the grievance is to be settled by arbitration.[51]

Plaintiffs have not alleged that they exhausted the grievance procedure prescribed by the 2015 CBA.  Consequently, their first and third causes of action must be dismissed.[52]  See *Cha v. Kaiser Permanente*, No. C-14-4672-EMC, 2015 WL 434983, *4 (N.D. Cal. Feb. 2, 2015) ("Ms. Cha apparently has not [attempted to exhaust her CBA's grievance or arbitration remedies], and so her claim will be dismissed with leave to amend"); *Abdur-Rasheed v. Peralta Community Colleges (Laney Coll.)*, No. C 11-01744 SBA, 2012 WL 1965617, *4 (N.D. Cal. May 31, 2012) ("In light of Plaintiff's failure to

_____

[47]2015 CBA, § XVII.

[48]*Id.*

[49]*Id.*

[50]*Id.*

[51]*Id.*

[52]At the hearing, plaintiffs argued that they could not have complied with the grievance and arbitration provision of the 2015 CBA because the CBA was not signed until more than 14 days after they should have been paid.  As a result, they asserted, the exhaustion requirement should be waived or deemed satisfied.  As neither party briefed the law applicable to this issue, the court declines to decide it at this stage of the proceedings.

1   exhaust her administrative remedies under the CBA, the Court GRANTS Peralta's motion to dismiss

2   Plaintiff's eighth claim for breach of the CBA.  Said claim is dismissed with leave to amend").[53]

3   **C.    Plaintiffs' Request for Attorneys' Fees**

4           In the event the court remands the case, plaintiffs seek attorneys' fees under 28 U.S.C. § 1447(c).

5   "Under 28 U.S.C. § 1447(c), '[a]n order remanding the case may require payment of just costs and any

6   actual expenses, including attorney fees, incurred as a result of the removal.'" *Leon v. Gordon Trucking,*

7   *Inc.*, No. CV 14-6574 MMM (MRWx), 2014 WL 7447701, *11 (C.D. Cal. Dec. 31, 2014). "'Absent

8   unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party

9   lacked an objectively reasonable basis for seeking removal.  Conversely, when an objectively reasonable

10  basis exists, fees should be denied.'" *Id.* (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141

11  (2005)).

12          "Removal is not objectively unreasonable solely because the removing party's arguments lack

13  merit and the removal is ultimately unsuccessful." *Id.* (citing *Lussier v. Dollar Tree Stores, Inc.*, 518

14  F.3d 1062, 1065 (9th Cir. 2008)). "Rather, the court should assess 'whether the relevant case law clearly

15  foreclosed the defendant's basis of removal' by examining the 'clarity of the law at the time of

16  removal.'" *Id.* (quoting *Lussier*, 518 F.3d at 1066); see also *Patel v. Del Taco, Inc.*, 446 F.3d 996, 999-

17  1000 (9th Cir. 2006) ("Del Taco's state court petition to confirm the arbitration award contained only

18  one state law cause of action; it did not contain any federal claim that could provide the basis for a §

19  1441(c) removal.  Joinder of a federal claim and a claim for removal of a state court action in a federal

20  complaint cannot effect a § 1441(c) removal.  There being no objectively reasonable basis for removal,

21  the district court did not abuse its discretion in awarding attorney's fees under § 1447(c) to Del Taco").

22          The court has concluded that plaintiffs' first through fifth causes of action are preempted by §

23  301 of the LMRA; defendant thus properly removed on the basis that the court had federal question

24  jurisdiction to hear the action.  Consequently, there is no basis for awarding fees to plaintiffs.

25

26  _____

27  [53]Live Nation did not move to dismiss the second, fourth, and fifth causes of action.
    Consequently, the court does not address them.  It notes, however, that the claims are deficient for the

28  same reason that the first and third causes of action are.

### III.  CONCLUSION

For the reasons stated, the court dismisses plaintiffs' first and third causes of action with leave to amend.  Plaintiffs may file an amended complaint within twenty (20) days of the date of this order if they are able to remedy the deficiencies the court has noted.  The amended complaint should plead federal causes of action in lieu of state law claims, consistent with the court's findings herein regarding § 301 preemption.  Plaintiffs may not plead additional claims or add allegations that are not intended to cure the specific defects the court has noted.  Should any amended complaint exceed the scope of leave to amend granted by this order, the court will strike the offending portions under Rule 12(f).  See Fed.R.Civ.Proc. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."); see also Barker v. Avila, No. 2:09-cv-00001-GEB-JFM, 2010 WL 3171067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to federal law claim where the court had granted leave to amend only state law claims).

Plaintiffs' motion to remand is denied.  Their request for attorneys' fees is also denied.

DATED: November 12, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE